IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KRISTY M. KELLER-SMITH,

Plaintiff,

v.

RELIANCE STANDARD LIFE INSURANCE
COMPANY,

Defendant.

CIVIL ACTION
NO. 17-1549

## OPINION

**Slomsky, J.**                                                                 **August 23, 2018**

## I.    INTRODUCTION

On April 5, 2017, Plaintiff Kristy M. Keller-Smith, a former employee of McCain Foods,

USA, Inc., initiated this action seeking benefits pursuant to the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. (Doc. No. 1.) Plaintiff was a

beneficiary of McCain's Long Term Disability Plan (the "Plan"), which is an ERISA employee

welfare benefit plan. (Id. ¶¶ 8-10.) The long-term disability benefits she sought are insured and

issued by Defendant Reliance Standard Life Insurance Company. (Id. ¶ 9.) In her Complaint,

Plaintiff alleges that Defendant breached its fiduciary duty to her by denying her claim for long

term disability (LTD) benefits. An Answer to the Complaint was filed on April 18, 2017. (Doc.

No. 6.)

Presently before the Court are the parties' cross-motions for summary judgment pursuant

to Federal Rule of Civil Procedure 56 as well as Plaintiff's alternative motion for judgment on

the ERISA record pursuant to Federal Rule of Civil Procedure 7(b) and ERISA, § 501(a)(1)(B).

(Doc. Nos. 23, 26.) Defendant claims that Plaintiff's inability to work is due to a mental disorder

1

and that because she already exceeded the 24 months of benefits allowed for such a disorder, she is not entitled to additional benefits under the Plan. (Doc. No. 23-36 at 1.) Defendant also argues that Plaintiff has failed to show that "by itself, [her] physical disability precluded [her] from engaging in any gainful occupation regardless of any concurrent mental condition." (Doc. No. 23-36 at 9) (citing Michaels v. The Equitable Life Assurance Soc'y of the U.S. Emps., Managers, & Agents Long-Term Disability Plan, 305 F. App'x 896, 904 (3d Cir. 2009). In her Motion, Plaintiff argues that she suffered from a physical disability, which is supported by medical evidence, and that Defendant's denial of benefits was arbitrary and capricious. (Doc. No. 26-2 at 13–16, 20.)

For reasons that follow, the Court will grant Defendant's Motion for Summary Judgment (Doc. No. 23) and deny Plaintiff's Motion for Judgment on the ERISA record and/or Summary Judgment (Doc. No. 26).[1]

## II.    STATEMENT OF FACTS

### A. Plaintiff's Employment

From September 2007 to May 2009, Plaintiff Kristy M. Keller-Smith was employed by McCain Foods, USA, Inc. as a prime line batter operator[2] and a general production worker.

---

[1] In making a decision, the Court has considered the following documents: the Administrative Record (Doc. Nos. 23-3 to 23-25); Defendant's Motion for Summary Judgment (Doc. No. 23); Plaintiff's Motion for Judgment on the ERISA Record and/or for Summary Judgment (Doc. No. 26); Plaintiff's Response in Opposition to Defendant's Motion (Doc. No. 27); Defendant's Response in Opposition to Plaintiff's Motion (Doc. No. 28); Plaintiff's Sur-Reply (Doc. No. 29); Defendant's Sur-Reply (Doc. No. 30); and arguments made by counsel at the June 22, 2018 hearing on the Motions.

[2] According to McCain's job description, a prime line batter operator is "responsible for batter products that meet all quality specifications." (Administrative Record ("R.") at 454.) A batter operator's job function includes: monitor line operations; collect samples and perform tests; perform recordkeeping; utilize fork truck to line up sacks of dry batter mix and move

(Doc. No. 26-2 at 2-3.) Her primary duties included: using a touch screen control station to set up equipment; communicating with other employees; calculating batter solids; determining batter pickups and viscosity, understanding and adhering to concepts and techniques of quality process; promoting and adhering to company safety regulations; and building and promoting a strong continuous improvement environment in each individual work group. (Administrative Record ("R.") at 454.)

## B. The Policy

Through her employment, she was insured under a group LTD policy issued by Defendant to McCain. (Doc. Nos. 23-2 ¶¶ 1-2, 26-1 ¶¶ 1-2.) The policy states that Defendant will "pay a Monthly Benefit if an Insured: (1) is Totally Disabled as a result of a Sickness or Injury covered by this policy; . . . and (4) submit satisfactory proof of Total Disability" to Defendant. (Doc. Nos. 23-2 ¶ 3, 26-1 ¶ 3.) "Totally disabled" and "total disability" are further defined in the policy:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:
>
> (1) during the Elimination Period and for the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation;
>
>   (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her Regular Occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled except during the Elimination Period;
>
>   (b) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and

pallets; change sacks of dry batter mix; hook up hoses to beer trucks; and maintain cleanliness of the batter line area. (R. at 456.)

(2) after a Monthly Benefit has been paid for 36 months, an Insured cannot perform the material duties of Any Occupation. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

(R. at 250.) The policy also includes a limitations provision, which states:

MENTAL OR NERVOUS DISORDERS: Monthly Benefits for Total Disability caused by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period. The Monthly Benefit will be payable while so confined, but not beyond the Maximum Duration of Benefits.

***

Mental or Nervous Disorders are defined to include disorders which are diagnosed to include a condition such as:

(1) bipolar disorder (manic depressive syndrome);

(2) schizophrenia;

(3) delusional (paranoid) disorders;

(4) psychotic disorders;

(5) depressive disorders;

(6) anxiety disorders;

(7) somatoform disorders (psychosomatic illness);

(8) eating disorders; or

(9) mental illness.

(R. at 21.) To sum up the policy, Defendant

will pay a Monthly Benefit if an Insured:

(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy;

(2) is under the regular care of a Physician;

(3) has completed the Elimination Period; and

4

(4) submits satisfactory proof of Total Disability to us.

(R. at 17.)

## C. The Initial LTD Claim

On December 2, 2007, another employee slammed an interlocking door, injuring Plaintiff's right hand. (R. at 351.) Then, about one and a half years later, on May 18, 2009, Plaintiff had a nervous breakdown.[3] (Id.) Two days later, on May 20, 2009, Plaintiff stopped working. (Doc. No. 26-1 ¶ 11.) On November 6, 2009, Plaintiff submitted a claim to Defendant to obtain LTD benefits, identifying her first symptoms as: "depression, anxiety, couldn't sleep, right arm pain, and always tired and crabby, couldn't focus." (R. at 351.) She noted both the hand injury and her nervous breakdown. (Id.) By a letter dated February 12, 2010, Defendant approved Plaintiff's claim, stating that she had "met the group policy's definition of Total Disability." (R. at 250-51; 351-55.) Moreover, she was approved for LTD benefits because her disability occurred as a result of a mental or nervous disorder." (R. at 250-51.)

## D. Defendant's Termination of the LTD Claim

On March 15, 2010, Defendant sent Plaintiff a letter requesting "updated information in order to review [her] ongoing eligibility for disability benefits." (R. at 253.) In particular, it requested medical records from February 11, 2010 up to March 15, 2010. (Id.) The letter informed Plaintiff that if Defendant did not receive the requested information within 30 days, her benefits may be terminated. (R. at 253.) On April 5, 2010, Defendant sent another letter to Plaintiff stating that it had not received the requested information and that if it did "not receive the requested information by April 19, 2010, [it] will have no alternative but to make [its]

---

[3]    The administrative record does not indicate what caused Plaintiff's nervous breakdown.

ongoing disability benefits decision based on the information currently in [Plaintiff's] claim file which may lead to termination of benefits." (R. at 254.)

On May 3, 2010, Defendant informed Plaintiff it received notice from Plaintiff's psychiatrist, Dr. Ashraf Ahmed, that she "would be ready to return to work full duty on June 1, 2010."[4] (R. at 258.) As a result, Defendant closed Plaintiff's claim. (Id.) On July 12, 2010, Dr. Brad K. Grunert, Plaintiff's psychologist, sent a letter to Defendant, but this time in support of Plaintiff's claim stating that the "combination of her pain disorder, her arm injury, and her major depressive disorder render her unable to return to competitive employment at this point in time." (R. at 512.) On July 10, 2009, Dr. Carlos Castillo, Plaintiff's psychiatrist at the time, submitted a report stating that Plaintiff suffered from bipolar disorder and Attention Deficient Hyperactivity Disorder and that she was unable to work. (R. at 422-23.) On July 22, 2010, Defendant sent a letter to Dr. Grunert, asking him to provide his progress test results for Plaintiff dating from February 2010 to the date of its letter. (R. at 543.)

Meanwhile, on or about August 3, 2010, Plaintiff visited a pain management specialist, Dr. Alexander E. Yakovlev, who diagnosed her with reflex sympathetic dystrophy (RSD). (R. at 545). At Dr. Yakovlev's recommendation, she had a temporary spinal cord stimulator implanted.[5] (R. at 548.) On August 6, 2010, she had a follow up appointment with Dr.

---

[4] This statement contradicts a document contained in the record from Dr. Ahmed to Defendant dated May 7, 2010 in which he reports that Plaintiff is unable to work due to depression and irritability and that her anticipated return-to-work date was undetermined. (R. at 509-10.)

[5] "Spinal cord stimulation ("SCS") is a pain-relief technique that delivers a low-voltage electrical current continuously to the spinal cord to block the sensation of pain. SCS is the most commonly used implantable neurostimulation technology for management of pain syndromes." Spinal Cord Stimulation, Am. Ass'n of Neurological Surgeons, http://www.aans.org/Patients/Neurosurgical-Conditions-and-Treatments/Spinal-Cord-Stimulation#main-content (last visited July 26, 2018).

Yakovlev, who acknowledged the presence of RSD in her right upper extremity and reported that Plaintiff indicated that she wanted to "proceed with spinal cord stimulator implantation" since the temporary stimulator seemed to relieve her pain. (R. at 546.)

On October 15, 2010, Defendant terminated Plaintiff's benefits because the medical information in her file did not support a finding that she was unable to perform material duties of her occupation. (R. at 261.) The letter also mentioned:

> A Vocational Rehabilitation Specialist has reviewed and considered all relevant information in your claim file and determined that your occupation is classified as Light . . . .
>
> Our records indicate that you went out of work effective May 20, 2009 due to Bipolar Disorder. Your medical records show that you were released to [return to work] on June 01, 2010 for this condition. In order to evaluate whether or not you continue to meet the above definition of disability beyond June 1, 2010, we requested and received your updated medical information from Dr. Grunert, Interventional Pain Management. The updated medical records are dated July 12, 2010 through August 10, 2010.
>
> In order to determine your level of functionality, your claim was referred for a medical records review by our medical department. The report dated October 1, 2010 noted restriction and limitations of less then [sic] a light level are supported to June 1, 2010. You underwent a trial of a spinal cord stimulator on August 03, 2010 for your diagnosis of Reflex Sympathetic Dystrophy of the right upper extremity as well as neck and back pain. You reported on August 10, 2010 that you felt complete relief and would like to proceed with the implant.
>
> In addition; you reported that you have obtained 100% relief from the spinal cord stimulator trial. Given the medical information contained in your file this does not support restrictions and limitations of less than light work beyond June 01, 2010. The medical information contained in your file does not support your inability to perform the material duties of your occupation as a Laborer. Therefore we are denying further benefits beyond June 01, 2010.

(R. at 261.)

On April 15, 2011, Plaintiff appealed the termination of her benefits, submitting the reports and medical records of Dr. Grunert, as well as the medical records of Comprehensive

Pain Management[6] and Dr. Ahmed. (R. at 557.) Dr. Ahmed also submitted a letter stating: "Plaintiff is presently under my care for bi-polar disorder. I believe the patient is totally disabled from her occupation as a laborer from June 1, 2010 and ongoing due to this condition." (R. at 592.) On August 17, 2011, upon its independent review of Plaintiff's claim file and additional information she submitted, Defendant placed Plaintiff back on claim. (R. at 613.)

## E. Defendant's Second Termination of the LTD Claim

On November 22, 2011, Defendant requested Plaintiff's medical reports and records from the clinics or centers where she was being treated for the period of May 2011 to the date of the letter. (R. at 625-45.) On March 1, 2012, Plaintiff provided Defendant with a completed "Activities of Daily Living" questionnaire in which she identified her current medical conditions as "RSD, possible multiple sclerosis, depression, bi-polar, Attention Deficit Hyperactivity Disorder, anxiety and panic disorder, degenerative joint dysplasia." (R. at 663-64.) She reported that she had "[t]otal loss of hand control. I can't do buttons. I can't do my hair or makeup because my right arm is too 'dead' to do anything with it . . . I fall getting dressed, walking up [and] down stairs . . . . (R. at 667.)

On June 20, 2012, Defendant notified Plaintiff that as of November 16, 2012, Plaintiff will have received LTD benefits for a period of 36 months. (R. at 280.) Pursuant to the LTD policy, it reiterated that "to be eligible for LTD benefits beyond the initial 36 month period, [Plaintiff] must satisfy a stricter definition of Total Disability which requires [her to] be unable to perform the material duties of any occupation that [her] training, education or experience will reasonably allow." (Id. (emphasis added).) Accordingly, Defendant requested additional

---

[6] Comprehensive Pain Management is the medical clinic or firm in which Dr. Yakovlev practices. (R. at 550, 560.)

8

information concerning her medical conditions, education, training, and experience. (R. at 281.) As part of the information it received, progress reports taken on July 29, 2013 by Joelle J. Fellinger, a behavioral health specialist and evidently also Plaintiff's treating psychiatric provider,[7] revealed that Plaintiff's "only 'out'" was riding horses. (R. at 1276, 1602.) Plaintiff told Fellinger that she had a friend who "started working a ranch to break new horses" and that Plaintiff "has been trying to help her out but fell off a horse twice and now lost her confidence." (Id.)

Next, on June 30, 2014, Defendant determined that Plaintiff was no longer entitled to LTD benefits. (R. at 333.) Based upon its review of the submitted medical records and reports, Defendant concluded that Plaintiff "retain[ed] the ability to perform the material duties of [her] occupation." (R. at 334.) It acknowledged that Plaintiff had informed her behavioral health specialist that she was considering enrolling in school and opening an e-cigarette store. (Id.) Defendant also noted that Plaintiff had reported to the specialist that she renewed her "manager's license for cosmetology, took a 6 hour class and was filling in one day a week at a barber shop for a friend . . . ." (Id.) Defendant highlighted that Plaintiff did not provide progress notes or

---

[7]   In a letter dated October 31, 2014, Fellinger states that she has been treating Plaintiff since August 23, 2012. (R. at 1602.) In this letter, Fellinger also provides the following clarification:

> It has also been noted that [Plaintiff] worked for 1-2 days answering phones for a friend's business when the friend was short staffed. This was not permanent employment and was very time limited. She also entertained the idea of opening up an E-cig Vapor shop but this was during a time when she had elevated mood symptoms and was feeling more impulsive. The plan was not well thought through and never came to fruition. It is in my opinion that Kristy remains unable to work . . . Though her psychiatric illness has been largely controlled, she continues to be functionally impaired and will require long term treatment.

(Id.)

diagnostic test reports regarding her physical condition of chronic pain and concluded the following:

> Based on the review of this information provided, it is reasonable that you continue to experience symptoms from your Bipolar Disorder and Attention-Deficit Hyperactivity Disorder as you reported fluctuating between hypomania and depression. However, the psychiatric issues do not appear to be impairing as you reported that you were working one day a week in a barber shop, met with a vocational evaluator with plans to start school, working on opening an e-cigarette store and dealing with a Workers' Compensation claim for settlement. At this time, we are unable to determine impairment regarding your physical condition of chronic pain syndrome beyond the current June 01, 2014 date as there were no progress notes or diagnostic test reports submitted for review by any treatment provider regarding treatment or evaluation for this condition.

(Id.) Thus, Plaintiff no longer met Defendant's definition of "total disability." (R. at 335.)

### F. Plaintiff's Appeal of Defendant's Second Termination of the LTD Claim

On or about October 1, 2014, Plaintiff requested review of Defendant's decision, which Defendant granted on February 3, 2015. (R. at 343, 1421.) Dr. Yakovlev, who has been treating Plaintiff since 2010, provided a report on Plaintiff's disability status accompanied by a residual functional capacity questionnaire that was filled out in December 2014. (R. at 1436–41.) He confirmed Plaintiff's RSD in her right arm was caused by the December 2, 2007 accident at McCain. (Id.) He also confirmed that she suffered from frequent pain in both arms especially her right arm, and from symptoms of swelling, burning pain that spreads to other extremities, joint stiffness, restricted mobility, muscle pain/spasms, impaired sleep, and chronic fatigue. (Id.) He listed additional restrictions and limitations, and explained separate diagnoses of migraines, low back pain, and occipital neuralgia. (R. at 1437-39.) The questionnaire also noted "bilateral[8] forearm pins & needles and burning." (R. at 1440.)

---

[8]    In this context, "bilateral" means both arms.

On February 6, 2015, in connection with her request for review, Plaintiff submitted a vocational evaluation report and her own affidavit. (R. at 1528.) The vocational evaluation report, dated January 19, 2015, was written by John Woest, a vocational expert. (R. at 1532–34.) Based on Dr. Yakovlev and Dr. Grunert's opinions, Woest concluded that Plaintiff "clearly lacks the residual mental or physical capacity to perform the material duties of any occupation." (R. at 1534.) He asserted that she is incapable of performing low stress jobs and would likely miss over four days a month for treatments. (Id.) Meanwhile, Plaintiff's affidavit, signed on November 5, 2014, clarified that she only worked once in the barber shop which simply consisted of answering a phone, and that while she would like to return to school, she could not due to her disabilities. (R. at 1538.)

Next, on April 21, 2015, Defendant, as part of Plaintiff's appeal review, sent Plaintiff to an in-person independent medical examination performed by Dr. William Fowler, a physical medicine and rehabilitation doctor. (R. at 1737–44.) He concluded her activity was limited to sedentary work, occasional pushing and pulling, and occasional use of her hands for gross motor skills[9] and fine dexterity skills. (R. at 1743.) He also reported that Plaintiff had hypersensitivity in her upper extremities, until distracted, at which time she reported no tenderness.[10] (R. at 1741.) Additionally, he reported that Plaintiff's strength was normal during the independent examination. (Id.)

---

[9] "[T]he ability to use large muscle groups for activities or functions such as maintaining balance, walking, and running; called also gross motor skills." Gross Motor Function, Dorland's Illustrated Medical Dictionary 749 (32d ed. 2012).

[10] "She reported some allodynia initially during my palpation along her right palm, but later during distraction no specific tenderness or other such adverse response was noted." (R. at 1741.) Allodynia is pain resulting from a non-noxious stimulus to normal skin. Allodynia, Dorland's 51.

On April 30, 2015, Carol Vroman, a vocational rehabilitation specialist, conducted a Residual Employability Analysis, which relied on Dr. Fowler's opinion. (R. at 1754-1761.) Vroman listed skills that Plaintiff would have acquired through her previous employments as a general production worker, batter mixer, and barber. (R. at 1755.) She concluded that Plaintiff has transferable skills to work as an information clerk, a sedentary position. (R. at 1755.) This conclusion supported Defendant's claim that Plaintiff could perform some work and that she would not meet the requirements under Defendant's "any occupation" standard. (R. at 281.) Since she could perform the material duties of "any occupation," she would not be considered "totally disabled."

### G. Defendant's Final Denial

On May 27, 2015, Defendant issued its final denial of Plaintiff's benefits, upholding its previous decision. (R. at 345–49.) It determined that although Plaintiff could no longer perform her previous occupation of prime line batter operator, based on Dr. Fowler's opinion and Vroman's vocational report, she could work instead as an informational clerk.[11] (R. at 348.) Dr. Fowler, reported that based on his review of her available medical records and his interview with

---

[11] The primary duties of an Information Clerk are:

1. Provides information regarding activities conducted at establishment, and location of departments, offices, and employees within organization.

2. Informs customer of location of store merchandise in retail establishment.

3. Provides information concerning services, such as laundry and valet services, in hotel.

4. Received and answers requests for information from company officials and employees.

(R. at 1759.)

Plaintiff, "from a purely physical standpoint, and as is relevant only to her described persisting bilateral upper extremity discomfort, she is capable of working on a full-time consistent basis at a so-called sedentary level . . . ." (R. at 347.)  It disregarded Woest's vocational opinion because he had not provided a residual employability analysis. (Id.)  Defendant also noted that Plaintiff received benefits under the Mental and Nervous Disorders limitation, which provides benefits for 24 months. (R. at 348.)  Because the 24-month period had expired, she was no longer eligible for additional benefits under the Mental and Nervous Disorders limitation provision. (Id.)  The final denial did not mention Dr. Yakovlev's opinion.

In sum, Defendant terminated Plaintiff's benefits based on its conclusion that (1) Plaintiff had already received the maximum allowable benefit for a mental or nervous disorder[12] and that (2) Plaintiff was not physically disabled from any occupation based on the lack of evidence to corroborate her claim of a physical impairment and the report of an independent medical examination, which refutes Plaintiff's claim. (R. at 345–49.)

### H. Cross-Motions for Summary Judgment

After exhausting her administrative remedies, Plaintiff filed a Complaint against Defendant in this Court on April 5, 2017. (Doc. No. 1.)  On November 9, 2017, Defendant filed a Motion for Summary Judgment, arguing that any disability she suffers from is caused by a mental or nervous condition and that no physical impairment prevents her from working in any occupation. (Doc. No. 23-36.)  It reiterated that Plaintiff failed to set forth sufficient evidence to

---

[12]  The May 25, 2017 letter stated:

> It should also be noted that your client's policy has a 24 month Mental and Nervous Disorders Limitation. As benefits have already been considered for Ms. Keller-Smith's psychiatric conditions for over 24 months, there are no additional benefits payable for any mental or nervous disorder.

(R. at 348.)

support her claim of physical disability. (Id.) Shortly thereafter, Plaintiff also moved for summary judgment, asserting that the medical records and opinion evidence on the record support her contention that she is disabled and therefore entitled to LTD benefits. (Doc. No. 26-2.) Plaintiff alleges that Defendant improperly ignored Dr. Yakovlev's opinion in their final denial, failed to acknowledge the report of a treating physician, and wholly relied upon Vroman's vocational report.

## III.    STANDARD OF REVIEW

### A.  Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment must be issued when "particular part of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(1)(A). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, when, as is the case here, there exists no genuine issue of material fact, summary judgment is appropriate after there has been "adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Unlike typical summary judgment proceedings, courts reviewing dispositive motions in ERISA cases have recognized that "summary judgment is simply a vehicle for deciding the [benefits] issue and the non-moving party is not entitled to the usual inferences in its favor."

14

Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 82-83 (1st Cir. 2010); LaAsmart v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 796 (10th Cir. 2010); Nolan v. Heald Coll., 551 F.3d 1148, 1153 (9th Cir. 2009) (explaining "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply").

## B. Denial of Benefits Under ERISA

The policy in this case does not contain language granting discretion to Defendant. Therefore, the de novo standard of review applies. Firestone Tire & Runner Co. v. Bruch, 489 U.S. 101 (1989). In applying the de novo standard, the Court must "determine whether the administrator made a correct decision." Viera v. Life Ins. Co. of N. Am., 642 F.3d 413 (3d Cir. 2011) (quoting Hoover v. Provident Life & Accident Ins. Co., 290 F.3d 801, 808-09 (6th Cir. 2002) (alteration omitted)). In doing so, "[t]he Court must review the record and 'determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan.'" Viera, 642 F.3d at 414 (citing Hoover, 290 F.3d at 809). Plan administrators are "accorded no deference." Luby, 944 F.2d at 1194.

## IV. ANALYSIS

### A. Plaintiff Failed to Satisfy Her Burden of Proving a Physical Disability Under the "Any Occupation" Standard

First, the Court turns to the language of the policy at issue. The benefit provisions to which Plaintiff was entitled through her employment at McCain define "total disabled" and "total disability" as follows:

[To] mean that as a result of an Injury or Sickness during the Elimination Period[13] and for the first 36 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regulation Occupation . . . and after a Monthly Benefit has been paid for 36 months, an Insured cannot perform the material duties of Any Occupation. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

(R. at 10.) Put another way, a claimant must first show that she is unable to conduct the material duties of her actual occupation for the first 36 months following the onset of her disability to be eligible for benefits. Then, after the 36 months have elapsed, she must then show she is unable to perform the material duties of <u>any</u> occupation for which she may be qualified to remain entitled to benefits.

The policy also provides that "partially disabled" and "partial disability" refers to when an Insured, as a result of injury or sickness, "is capable of performing the material duties of his/her Regular Occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period." (R. at 10.) Meanwhile, "residual disability" means "being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability." (Id.) The policy also states: "When we received written proof of Total Disability covered by this Policy, we will pay any benefits due. Benefits that provide for periodic payment will be paid for each period as we become liable." (R. at 14.)

Here, Plaintiff has failed to provide sufficient evidence showing that she is unable to perform the material tasks of any occupation and thus she has not met her burden to prove that she is unqualified to work in some capacity. "The claimant himself bears the burden of producing evidence of a caliber that will be 'satisfactory' to persuade the insurer that he is, in

---

[13] "Elimination Period" means a period of consecutive days of Total Disability . . . for which no benefit is payable. It begins on the first day of Total Disability." (R. at 9.)

16

fact, disabled and entitled to benefits." Schlegel v. Life. Ins. Co. of N. Am., 269 F. Supp. 2d 612 n.9 (E.D. Pa. 2003).

### 1. Defendant Was Permitted to Reject Dr. Yakovlev's Opinion

Defendant was not required to defer to Dr. Yakovlev's opinion and properly denied her claim based upon other evidence showing that Plaintiff's disability emanated from her mental and nervous disorders.

The United States Supreme Court has held that ERISA does not require plan administrators "automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Furthermore, "ERISA plan administrators do not have an independent duty to develop the record." Das v. UNUM, Civ. A. No. 04-0971, 2005 WL 742444, at *10 (E.D. Pa. Mar. 31, 2005), aff'd, 222 F. App'x 126 (3d Cir. 2007).

Plaintiff relies heavily on the opinion of Dr. Yakovlev, her pain management specialist, and refers to the doctor's multiple progress notes. For example, Plaintiff points to progress notes completed on May 7, 2014, where Plaintiff rated her pain level at 8 out of 10 and that her chief complaint was upper extremity and global joint pain. (R. at 1287.) In this report, however—which is signed not by Dr. Yakovlev but by an advanced practice nurse prescriber—Plaintiff acknowledged that she is "under quite a bit of stress" and that she "has had a very stressful few months, has had some issues with her children and now is having some issues with her lawyer . . . ." (Id.)

During a separate visit on September 26, 2014 to Comprehensive Pain Management, where Dr. Yakovlev practices, Plaintiff reported her pain level at a 6-8 out of 10 and that her

17

prescribed medication was "working well for her." (R. at 1443.) At this visit, Plaintiff complained of depression and anxiety but denied stiffness and swelling. (R. at 1444.) Then, on April 14, 2014, Plaintiff reported that she had begun to exercise and reported her pain level at 6-7 because she was sore from exercising. (R. at 1295.) On June 5, 2014, Plaintiff rated her pain level at 7 and reported that "she is in litigation for a workman's comp issue. At this point she does report that she goes to court this month which has caused some increased anxiety and in some ways has exacerbated her pain but on average her chronic medication regimen has been adequate for her and she denies any need for change." (R. at 1464.)

As mentioned supra, on December 11, 2014, Dr. Yakovlev had completed a form on Plaintiff's disability status in which he acknowledges the accident injuring her hand and confirming a diagnosis of RSD in Plaintiff's right arm. (R. at 1436.) He simply states that Plaintiff's temporary limitation is that she "can't return to work" and that her permanent limitation is that she "is disabled." (Id.) The form asks whether, in the doctor's opinion, "is it probable that the event in item 4 [i.e., the accident] directly caused the disability?" (Id.) Dr. Yakovlev checked the box marking "yes." (Id.) He also states that Plaintiff suffers from "100% permanent disability" and that she "has frequent intractable right and left arm pain. Right more than left. Any activities make her pain worse." (R. at 1436.) He also states that Plaintiff is incapable of even "low stress" jobs. (R. at 1439.) No further elaboration is provided. In the same form, Dr. Yakovlev also notes that Plaintiff could occasionally lift a 20 pound load in a competitive work situation and has the "ability to walk .32 miles in 7 minutes 47 seconds with little resting." (R. at 1437-38.)

Meanwhile, on November 20, 2014, Dr. Brad Gruner, Plaintiff's psychologist, submitted a letter to Plaintiff's counsel stating that Plaintiff

18

continues to struggle significantly at this point in time. She has a bipolar type 1 disorder with clear evidence of manic episodes . . . . I can firmly attest that [Plaintiff] has not been capable of working during this time in any capacity. She has delusions which are consistent with her mania of being able to do many things that she is clearly incapable of doing from a physical or psychological standpoint. Among these were her whole preoccupation for a period of time with opening an e-cigarette store. After working with her therapeutically, she finally came to the conclusion that this would neither be physically nor psychologically appropriate for her to even attempt. As is typical with individuals with mania, they vacillate between periods of extreme energy with almost psychotic thinking but clearly delusional thinking and periods of abject depression. While this has improved significantly with the medication that she is taking, she still is not at a point where she would be capable of maintaining ongoing employment in a competitive atmosphere . . . .

(R. at 1487.) He continues to acknowledge her actions which indicated to him "the ongoing severe nature of her bipolar disorder" which "would bode poorly for her in any work environment." (R. at 1488.) Similarly, Joelle Fellinger, Plaintiff's other treating psychiatric provider, opined that Plaintiff was unable to work through her October 31, 2014 letter. (R. at 1489-90.)

In weighing Dr. Yakovlev's findings against Dr. Grunert and Fellinger's opinions, Plaintiff appears to be suffering from a disability mainly caused by mental, not physical, disorders. During her appointments with the pain management specialists, although she reported pain, she also consistently mentioned her stress and anxiety levels. During her June 5, 2014 visit, she even surmised that the stress of her workman's compensation litigation was making her physical pain worse. Although he reports Plaintiff's RSD and her inability to work, Dr. Yakovlev has not provided the results of any tests to confirm the diagnosis of RSD. Regardless, the issue is not whether Plaintiff suffers from RSD, but rather whether the RSD prevents her from working in any occupation. Aside from Dr. Yakovlev statement that Plaintiff is 100% disabled and that she is unable to work, there is no evidence that shows that the RSD inhibits her ability to work at all. In fact, there is ample evidence on the record that indicates Plaintiff's

mental disability, particularly her bipolar disorder, is the source of her inability to work. Accordingly, Defendant properly rejected Dr. Yakovlev's medical opinion in light of the contradictory evidence on the record which shows Plaintiff's debilitating bipolar disorder.

### 2. Plaintiff Has Failed to Show that She is Unable to Perform the Material Tasks of Any Occupation

Because there was evidence that Plaintiff had the ability to perform light tasks, she fails to meet the "any occupation" standard of Defendant's policy.

The policy defines "any occupation" as "an occupation normally performed in the national economy for which an Insured is reasonably suited based upon his/her education, training or experience." (R. at 9.)

Plaintiff submits that the severity of her RSD worsened to the point where she had to leave her job. She again relies on Dr. Yakovlev's reports containing his opinion that she was unable to work. She also had submitted her affidavit signed on November 5, 2014, in which she states that the June 30, 2014 letter terminating her benefits contained errors, which she sought to clarify. (R. at 1538.) Among her clarifications, Plaintiff said that she would have liked to resume working but was unable to do so because of her disabilities. (Id.) She acknowledged that she had taken a 6-hour class to renew her manager's license for cosmetology but her objective was to "qualify for a discount on haircare products [she] purchase[s] for [her] personal use" rather than to work as a cosmetologist. (Id.) She also explained that her answering the phone at her friend's barber shop was an isolated incident and that she had only done it to fill in for her friend who had an appointment. (Id.)

As part of Plaintiff's appeal, John Woest, a vocational consultant, submitted a letter on Plaintiff's behalf. Woest, who has met Plaintiff twice and spoken to her on the phone once, analyzed the opinions of Fellinger, Plaintiff's behavior health provider, Dr. Gruner, Plaintiff's

20

treating psychologist, and Dr. Yakovlev, Plaintiff's treating pain specialist. (R. at 1532.) He concludes that Plaintiff is not employable because "[s]he clearly lacks the residual mental or physical capacity to 'perform the material duties of any occupation.'" (R. at 1533.)

On the contrary, Carol Vroman, a vocational rehabilitation consultant engaged by Defendant, conducted a residual employability analysis finding that Plaintiff had the transferable skills to work as an information clerk. (R. at 1754-61.) Vroman considered the medical opinion of Dr. Fowler, who performed an independent medical examination of Plaintiff and noted her ability to work "on a full-time consistent basis at a so-call sedentary level." (R. at 1743.) Vroman specifically did not consider any restrictions resulting from Plaintiff's psychiatric or mental conditions. (R. at 1755.) In forming an opinion, Vroman also considered Plaintiff's past work experience as a general production worker and batter mixer at McCain and also her remote work experience as a barber. (Id.)

Moreover, as referred to in Vroman's analysis, Dr. Fowler's opinion also supported the finding that Plaintiff was capable of working in any occupation. Dr. Fowler acknowledged the existence of RSD in Plaintiff's right hand and stated that Plaintiff's "main issue impacting her functional status is her distal[14] upper extremity discomfort." (R. at 1742.) He conducted extensive review of her medical records and examined Plaintiff himself and found that "from a purely physical standpoint, and as is relevant only to her described persisting bilateral upper extremity discomfort, she is capable of working on a full-time consistent basis at a so-called sedentary level." (R. at 1743.) This means that she is able to "exert[] up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects including the human body." (Id.)

---

[14] "Distal" means "far from the point of attachment or origin." Distal, Webster's Ninth New Collegiate Dictionary 367 (1988).

21

Dr. Fowler's findings contradicted Dr. Yakovlev's opinion that Plaintiff was unable to work due to her physical limitations. Moreover, the overwhelming amount of evidence that suggested Plaintiff could not work stemmed from her mental diagnoses. Even Plaintiff's vocational expert made a vocational analysis mostly based upon the medical opinions of behavioral health specialists who cautioned against Plaintiff returning to work. Furthermore, Dr. Yakovlev did not submit any test results that he conducted or provide any further elaboration to assess Plaintiff's inability to work due to her RSD. Thus, Plaintiff has failed to meet her burden to prove that she was unable to work in any occupation, particularly in light of the evidence of her engaging in physical activities, such as riding horses, exercising, and participating in a course to renew a license. Upon review of the evidence in the record, Plaintiff may have been unable to work, but that inability was a result of her mental health condition, rather than any physical limitations. Because she had already been granted the maximum award for disability benefits under the two-year Mental and Nervous limitation of the policy, she is not entitled to further benefits. Accordingly, the Court will uphold the decision of Defendant denying her LTD benefits and grant its Motion for Summary Judgment.

## V.    CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment (Doc. No. 23) and deny Plaintiff's Motion for Judgment on the ERISA Record and/or Summary Judgment (Doc. No. 26). An appropriate Order follows.